UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DEBRA VAUGHN                                                                                       PLAINTIFF

v.                                                                    CIVIL ACTION NO. 3:03CV-541-S

LOUISVILLE WATER COMPANY                                                                  DEFENDANT

**MEMORANDUM OPINION**

This matter is before the court on motion of the defendant, Louisville Water Company ("LWC"), for summary judgment (DN 50) in this action alleging gender discrimination, hostile work environment, and retaliation. The plaintiff, Debra Vaughn, has filed a motion for leave to file additional evidence in opposition to summary judgment (DN 65) which will be granted.[1]

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent

---

[1]The court also has before it a companion case styled *Diana Cecil v. Louisville Water Company*, 3:03-CV-540-S which has similar pending motions. The plaintiffs were both complainants in a gender discrimination complaint filed with the U.S. Department of Labor, Office of Federal Contract Compliance Program ("OFCCP") which resulted in a three-year investigation and the issuance of a Notice of Results of Investigation ("NORI"). A NORI issued in the name of each complainant stated that the Department of Labor had found sufficient evidence to conclude that sexual harassment occurred and a hostile work environment existed at LWC. In light of the pendency of the district court actions, the Department of Labor declined to address the individual claims of the plaintiffs. The plaintiffs seek to supplement their documentation with the NORIs. They do not seek to introduce them for any preclusive effect. As such, they are admissible as investigative reports made by a government agency, in accordance with Fed.R.Evid. 803(8)(C). *See, Chandler v. Roudebush*, 425 U.S. 840, 863, n. 39, 96 S.Ct. 1949, 1960, 48 L.Ed.2d 416 (1976); *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 557-558 (6th Cir. 1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979). LWC objects to the consideration of the NORIs by Vaughn, noting that it has raised concerns about the impartiality of the investigation, and the reliability of unsworn and self-serving testimony gathered during the investigation. This goes to the weight rather than the admissibility of the evidence. Thus Vaughn will be permitted to file the NORIs in supplement to her memorandum.

summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Title VII of the Civil Rights Act of 1964 ("Title VII") makes it "an unlawful employment practice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

As a prerequisite to filing a Title VII action in this court, a plaintiff must first file a timely charge with the Equal Employment Opportunity Commission ("EEOC") and receive a Notice of the Right to Sue. Vaughn did so, filing her complaint with the EEOC and receiving a Right to Sue letter dated July 11, 2003. This action was filed on September 3, 2003, within the ninety-day limitation period. 29 C.F.R. § 1601.28(e)(1). All claimed violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, must be presented to the EEOC no later than "180 or 300 days after the occurrence of the unlawful practice to file a charge with the EEOC." *National*

*Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002). The Supreme Court further explained:

> The critical questions, then, are: What constitutes an "unlawful employment practice" and when has that practice "occurred?" Our task is to answer these questions for both discrete discriminatory acts and hostile work environment claims...We take the easier question first. A discrete retaliatory or discriminatory act "occurred" on the day that it "happened." A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it...[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period...[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges...Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice."...Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct...The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. [citations omitted]...Such claims are based on the cumulative effect of individual acts...Thus, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris*, 510 U.S., at 21, 114 S.Ct. 367 (citations omitted). In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, at 23, 114 S.Ct. 367...As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

*National Railroad Passenger Corp.*, 122 S.Ct. at 2070 - 74.

In order to establish a claim of gender discrimination, a plaintiff may rely on direct evidence of discrimination, if such evidence is available. Direct evidence is evidence that proves the existence of a fact without employing inference. *See. Grizzell v. City of Columbus Division of Police*, 461 F.3d 711, 719 (6th Cir. 2006), *citing, Rowan v. Lockheed Martin Energy Systems, Inc.*,

360 F.3d 544, 548 (6th Cir. 2004). Vaughn contends that she was improperly denied promotions, improperly denied pay at the accurate Pay Grade, improperly denied pay for overtime, had her title altered to cause a demotion, and was denied membership and training in the Leadership Institute. Vaughn Response, p. 38. Gender discrimination cannot be gleaned from these purported actions without the employment of inferences of an anti-female bias which Vaughn suggests should be drawn by viewing the work environment at LWC as a whole and considering much anecdotal evidence. This is not direct evidence of gender discrimination against Vaughn. *See, Grizzell*, 461 F.3d at 719.

In the absence of direct evidence, Vaughn may utilize the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this model, Vaughn must establish a *prima facie* case of gender discrimination on her failure to promote, job title, and outsourcing claims. If she establishes a *prima facie* case, the burden of production shifts to LWC to articulate a legitimate, nondiscriminatory reason for its actions. If LWC satisfies its burden of production, Vaughn must then prove by a preponderance of the evidence that LWC's nondiscriminatory reason for its actions was merely a pretext for intentional discrimination. The ultimate burden of persuasion rests with Vaughn to establish pretext. *McDonnell Douglas Corp.*, *supra*; *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Nguyen v. City of Cleveland*, 229 F.2d 559, 562 (6th Cir. 2000). Pretext may be shown by establishing that "the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her] discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)(emphasis in original and citations omitted). The law requires that "an employer not discriminate against an employee on the basis of the employee's protected class characteristics."

*Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000). Vaughn is then required to show that LWC's purported legitimate reason camouflages an unlawful employment action. However, "the soundness of an employer's business judgment may not be questioned as a means of showing pretext." *Chappell v. GTE Products Corp.*, 803 F.2d 261 (6th Cir. 1986). "The plaintiff[] may not simply substitute [her] own business judgment for that of the defendant." *Rowan*, 369 F.3d at 550.

To establish a *prima facie* claim of discrimination for failure to promote, Vaughn must show that (1) she is a member of a protected class, (2) she was qualified for and applied for an available position, (3) she was rejected, and (4) the position remained open and the employer sought other applicants or the position was awarded to someone outside the protected class. *Nguyen, supra.*

A hostile work environment claim, under Title VII, is actionable "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *National Railroad Passenger Corp*, 536 U.S. at 116. To establish a *prima facie* case of gender-based harassment, Vaughn must establish that (1) she was a member of the protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon gender; (4) the harassment was sufficiently severe or pervasive to create a hostile or abusive working environment; and (5) some basis exists for imputing liability to the employer. *See, Bowman v. Shawnee State University*, 220 F.3d 456, 464 (6th Cir. 2000); *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *Meritor Savings Bank, supra*. The Supreme Court has repeatedly held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Non-sexual conduct may be illegally sex-based and properly considered in the hostile environment analysis where it can be shown that but for the employee's sex, she would not have been the object of harassment. In *Bowman*, 220 F.3d at 463-64, the Sixth Circuit explained

> Any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the *Harris* [*v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)] standard, constitute a hostile environment in violation of Title VII. [quoting, *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999)]. However, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discrimina[tion]...because of...sex.'" *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)(emphasis in original). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citation omitted). We agree with the district court that while Bowman recites a litany of perceived slights and abuses, many of the alleged harassing acts cannot be considered in the hostile environment analysis because Bowman has not shown that the alleged harassment was based upon his status as a male...[I]t is important to distinguish between harassment and discriminatory harassment in order to "ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)...The only incidents that may arguably be considered in the hostile work environment analysis are the 1991 shoulder rubbing incident, the Christmas party incident, the 1994 whirlpool incident, the 1994 swimming pool incident, and the 1995 meeting in Jahnke's office...[W]e agree with the court's holding that the incidents that may properly be considered are not severe or pervasive and, thus, do not meet the fourth element of the hostile work environment analysis. While the allegations are serious, they do not constitute conduct that is pervasive or severe.

In determining whether the alleged harassment is sufficiently severe or pervasive, the court must consider the totality of the circumstances. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Williams*, 187 F.3d at 562, *quoting, Oncale*, 118 S.Ct. at 1003. The Sixth Circuit stated in *Williams*, 187 F.3d at 563,

> [T]he totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action. Hence, courts must be mindful of the need to review the work environment as a whole rather than focusing single-mindedly on individual acts of alleged hostility. As one court has noted: The [severe or pervasive] analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes."
> *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla. 1991).

The directive in *Williams,* then, is to evaluate whether the actions, properly viewed in context, "could be viewed by a jury as humiliating and fundamentally offensive to any woman in that work environment, and they go to the core of [the] entitlement ot a workplace free of discriminatory animus." *Williams*, 187 F.3d at 563.

To establish a *prima facie* case of retaliation*,* Vaughn must show that she (1) engaged in an activity protected by Title VII, (2) LWC knew of her exercise of protected rights, (3) LWC thereafter took an adverse employment action against her, and (4) there was a causal connection between her protected activity and the adverse employment action. *Virts v. Consolidated Freightways Corp. of Delaware*, 285 F.3d 508, (6th Cir. 2000)(*citing Williams, supra.,* and *Canitia v. Yellow Freight Systems, Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). The *McDonnell Douglas* burden-shifting matrix applies to this claim as well. An adverse employment action is a "materially adverse change in the terms and conditions of her employment." *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004), *quoting, Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999).

By way of background, LWC states that it is a municipally-owned utility that provides water to more than 800,000 customers in the Louisville Metro area, parts of Oldham and Bullitt counties. John Huber is the President and CEO of LWC. Edwin Chestnut is Assistant to the President and

Director of Buisness Performance Measures. Gregory Heitzman, Senior Vice President of Operations and Chief Engineer, reports directly to Huber. Under the vice presidents are "business system owners" which are similar to manager or director positions. Below business system owners are "process owners" which are equivalent to supervising or group leader positions.

Vaughn was hired in February 1992 for the position of Right of Way Administrator. Bill Rhodes was her supervisor until 1995 when Jim Asseff became the business system owner for the process. At that same time, Ron Eiler became Vaughn's process owner. Vaughn was responsible for easements, land acquisitions, review of consultants' work, review of Right of Way Associates' work, coordination of condemnations, attendance at mediation hearings, meetings with property owners, and completion of monthly reports. In 1994 Vaughn received approval to hire an assistant. She created the position of Right of Way Negotiator, wrote the job description, and hired Janet Clute for the position. Vaughn was responsible for Clute's job evaluations.

In 1996, the "Total Quality Management" system was implemented at LWC with attendant reorganization of personnel and processes. Two processes, Surveying and Right of Way, were merged. Asseff became the business system owner for the new process. He was succeeded by Susan Mueller who was later succeeded by Edwin Chestnut. Chestnut was the business system owner when Vaughn's employment was terminated in 2004. The merger of the two processes under one business unit entailed the creation of a new process owner position. The job description indicated that a surveyor's license was required for the position. Eiler held a surveyor's license while Vaughn did not. Vaughn did not apply for the position. Eiler became the process owner over the new process. Although Eiler was listed as Vaughn's process owner, the division of job responsibilities did not change. Eiler continued to run the Survey process and Vaughn continued to run and remain accountable for the Easement/Right-of-Way/Permits activity. In 2000 when her

- 8 -

assistant retired, Vaughn was again responsible for all of the work. She remained at a Pay Grade 9 and retained the same job title. She received only yearly percentage increases. Vaughn learned in June of 2002 that Eiler had received a promotion to Pay Grade 10 when he became the process owner over the new process. Vaughn also learned that the prerequisite of a surveyor's license for the position of process owner of her process had been eliminated in a the job description written in 2003. Eiler did not contribute to Vaughn's performance evaluations despite being listed as her process owner. Vaughn did not have difficulties working for Rhodes, Asseff, Mueller or Chestnut, and found her evaluations to be fair.

The claim of gender discrimination with respect to this process owner position is time barred. The job description was written and the job awarded to Eiler in 1996. Vaughn did not file her EEOC complaint until December 12, 2002. Thus claims relating to conduct occurring prior to February 15, 2002 are time-barred.[2] In any event, Vaughn did not apply for the position. She alleges that the requirement of a surveyor's license was written in specifically to preclude her from applying for the position. She says that a subsequent job description in which the requirement had been eliminated evidences that it was not necessary. She then urges the court to overlay the theme of "a pervasive anti-female bias" which she promotes in this and her other actions as the mechanism by which the court may conclude that the job description was written to include an unwarranted surveyor's license requirement to prevent her from applying for the position because she is female. Were this claim timely, we would find that the chain of generalized inferences required to reach the conclusion Vaughn suggests is tenuous at best. She did not apply for the position, although she urges that she would have done so. She contends that the drafting of the requirements for the position was done

---

[2]Vaughn's assertion of a "continuing violation" is without merit as regards "discrete acts" such as termination, refusal to hire, failure to promote or failure to transfer claims.

with her particularly in mind although she has absolutely no evidence of this. Something more than supposition is required to make a *prima facie* showing of gender discrimination claim.

Vaughn also urges gender discrimination based upon the discrepancy in pay between her position and Eiler's position.[3] She asserts that she was told that the new process owner position would not be a promotion for Eiler and that her position as Right of Way/Permits Administrator would not change, but in fact he was promoted to Grade 10 with the new position. She agrees that her status and responsibilities did not change. Eiler was promoted to process owner and her supervisor, but she maintained the same functions as before the reorganization. Vaughn does not contend that Grade 10 was not an appropriate grade for the position of process owner of the new process. She also does not dispute that the process owner was the supervisory position in the hierarchy and was a higher level than her administrator position. She stated that her job duties, title, and pay remained the same. She has not offered evidence that any male in equivalent positions made more than she did. Rather she points to Eiler in the process owner position as a comparator, and urges that he was essentially a *de facto* administrator rather than a process owner because he did not actually supervise her.[4] As Vaughn has not shown that her position changed nor has she shown that Garde 10 was an inappropriate grade for a supervisory position, her comparison is without merit. Her claim that she was told that the process owner position was not a promotion for Eiler is of no moment. Again she urges that the overlay of anti-female bias should indicate to the court that this was really an attempt to surreptitiously give Eiler a raise and avoid giving her a raise because

---

[3]We reiterate, on the same basis as stated earlier in the opinion, that this claim is time-barred. However, we address Vaughn's evidence and arguments for the sake of completeness.

[4]In fact, we note that Vaughn saw this as a good thing inasmuch as she had concerns about his behavior toward women and didn't think he should be given additional supervisory responsibilities. She was told that she would maintain her current status. She stated that she obtained her assignments from VP Heitzman,

she is female. As we noted, a disparity in pay has not been shown between Vaughn and any similarly situated male employee. She simply cannot compare the positions of process owner and administrator to support her claim.

In 1996, Vaughn applied for the position of Business System Owner of Supplying Customer Service. She claims that she was discriminated on the basis of her gender when she was not awarded the position.[5]

There were seven applicants for the position. A Prevue Report was conducted on the applicants where they were rated on their abilities, motivation/interests, and personality as compared to the desired traits for the position. Vaughn scored fifth out of the seven applicants, with a score of 80%. Two other females and two males obtained higher scores. A female and a male scored lower than Vaughn. An African American male applicant, Edwin Chestnut, with a score of 95% was awarded the job. Vaughn's contention that she was discriminated against is based solely on the fact that she met the listed job requirements. She has not raised any issue concerning the process of selecting the successful candidate beyond noting that Chestnut was not interviewed. She does not dispute Chestnut's qualifications or the fact that he had prior management experience in the Customer Service Department the previous two years. Notably, Vaughn does not contend that the lack of an interview rendered the selection process infirm. Vaughn urges that LWC was an "old boy network" in which she could not advance because of her gender. She has not shown with respect to her application for this position that gender played any role in the decision to award the position

---

[5]We find that this claim is time-barred for the same reasons as articulated with respect to the process owner position. However, we will examine the evidence and argument with respect to this claim.

to Chestnut from the field of seven applicants. Vaughn has failed to make a *prima facie* showing with respect to this claim.[6]

Vaughn's position was an exempt professional position for which she did not receive overtime pay.[7] She alleges that she discovered in 2002 that other male exempt professionals were paid overtime. Vaughn Response, pp. 8-9, 38-39. There is no evidence of this in the record. She has not identified any of these individuals. The only male she identifies in a higher pay grade is Eiler who was a process owner, an admittedly higher position than Administrator or Coordinator. She offers no evidence concerning the payment of overtime to non-exempt employees. Vaughn's assertion is in essence that it was unfair that she was not compensated for the many hours of overtime she purportedly accrued due to a heavy workload. She has offered no evidence that higher salaries were paid to unidentified males as a subterfuge for providing improper overtime pay to exempt employees. She cites to no record evidence in this regard. Rather she relies upon her fallback argument that it was LWC's agenda to disadvantage female employees in an attempt to bolster the argument that certain unidentified salaries must have been improper.

In 2002, Vaughn's position was changed from Administrator to Coordinator. Vaughn testified that there was not much which changed in the position such that she needed additional training to perform her job. Rather her assertion is that Coordinators were not afforded the opportunity to take training such as Leadership Institute Training and that this disadvantaged her with respect to promotion opportunities. She stated that she was told that she needed a broader base of knowledge and greater exposure to management in order to be competitive for promotion. She

---

[6] Vaughn stated in her response brief that she does not assert a 2001 Warehouse position claim. Vaughn Response, p. 38. Therefore we will consider the argument abandoned.

[7] There was no claim made before the EEOC regarding overtime pay.

concludes, without citation to record evidence, that her attempts for promotion were detrimentally affected by LWC's policy of providing its male employees with the training and advancement opportunities. The specific instances in which she sought promotion which were discussed herein belie the assertion that lack of leadership or other training negatively impacted her application.

The record is devoid of evidence that the position change from Administrator to Coordinator was a "demotion" except in the way that it was personally viewed by her. She admits that she did not suffer any change in the terms and conditions of her employment. She suffered no loss of pay or reduction in benefits. Nor is there evidence that the position change was designed by LWC to prevent her from obtaining training and thus impeding her ability to advance in the company. Further, there is simply no connection to gender in this regard beyond the general assertion that LWC has an anti-female bias. As noted with respect to her other claims, there must be more than a supposition on the part of Vaughn that LWC sought to disadvantage her on the basis of her gender in order to make out a *prima facie* claim of gender discrimination.

Vaughn contends that outsourcing of work in 2002 diminished her status in the Right of Way department. She has not further defended this claim in her response. She agrees that the outsourcing was applied to all employees in Right of Way, both male and female. Vaughn has thus apparently abandoned this claim.

Vaughn claims that LWC retaliated against her for complaining about discriminatory treatment to management, filing an EEOC claim, an OFCCP Charge and this civil action alleging discrimination, acts which constitute statutorily protected activity. 42 U.S.C. § 2000e-3 ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees...because he as opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge..."). She claims that in June of 2002 she complained

about the pay discrepancies and lack of overtime pay.  The first of the filings was her EEOC complaint in December of 2002.  Thus any acts which occurred prior to June of 2002 cannot be retaliation for exercise of her right to oppose discrimination.  *See, Randolph v. Ohio Department of Youth Services*, 453 F.2d 724 (6th Cir. 2006), *citing, Johnson v. University of Cincinnati*, 215 F.3d 561 (6th Cir. 2000)("opposing" conduct includes complaining to management based upon reasonable good faith belief that the opposed practices were unlawful).  Further, she must identify an adverse employment action which was taken against her.  Under the holding of *Randolph, supra., citing Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006), "[T]he anti-retaliation provision [of Title VII]...is not limited to discriminatory actions that affect the terms and conditions of employment."

The only subsequent adverse action alleged in the second count of the amended complaint was her discharge on May 10, 2004.[8]  Vaughn was on medical leave from LWC from January 2003 until her termination May 10, 2004.  She contends that her leave of absence was necessitated by the stress of her work environment and LWC's mistreatment of her.  She exhausted her medical leave and knew that she was expected to return to work on September 8, 2003.  She did not return.  She was terminated on May 10, 2004.  LWC states that it terminated her for failing to return to work. The only argument offered by Vaughn to establish that this legitimate, nondiscriminatory reason for her termination was pretextual is that LWC did not correspond with her to warn her that if she chose

---

[8]This is the only claim of retaliation articulated in the Amended Complaint.  Vaughn raises numerous other acts which she contends were retaliatory.  She alleges that intimidation and harassment by Eiler escalated after she voiced concerns about Eiler's discrimination against women and the perceived inequities in pay.  This includes "negative" scores used in evaluating her in October, 2002, and her contention that she was forced to continue working in a threatening environment.  The question concerning Eiler's conduct and LWC's response to it is part of Vaughn's hostile environment claim, and thus this alleged conduct will be considered in that context.  Delay in processing of her July 2002 disability benefits, and termination of her COBRA benefits which she raises for the first time in her response to the summary judgment motion were not claimed in an EEOC complaint, nor have they been claimed in this action.  These contentions will therefore not be further addressed.  She contends that she was "denied" the Process Owner position awarded to Kowalski.  Vaughn did not apply for the position.  The position was awarded to Kowalski who is female.

not to return in September that she would be terminated. As noted, Vaughn admits that she knew when she was expected to return. She stated that when she received notice of the termination she requested that it be rescinded. She concludes only that no reasonable person would return to such a hostile environment prior to effecting a change in the conditions. This argument does nothing to establish pretext. Thus summary judgment is warranted on her retaliatiory discharge claim.

Vaughn's claim of a hostile work environment at LWC is the central theme of this lawsuit and the thread which she uses to stitch together this purported anti-female bias to "incidents" which she contends impacted her employment. *See, Faragher v. City of Boca Raton*, 524 U.S. at 788. Her argument is essentially that LWC was such an anti-female employer that everything that occurred, no matter at what level or by whom perpetrated, was an exercise in squelching the rights and opportunities of women. Vaugn's brief is replete with broad-brush pronouncements to this effect, such as

> As Ms. Vaughn's employment continued with LWC she increasingly confronted problems with the atmosphere of male dominance, intimidation and fear. She supports this understanding with documented complaints that were systematically ignored for years. Ms. Vaughn attempted to address the issue by participating in diversity meetings. However, she was repeatedly met with retaliation, excuses, and disdain.

Vaughn Response, p. 10 (citing her own affidavit in support). While the court is directed to take a "holistic perspective" (*Williams*, 187 F.3d at 563)and evaluate the "constellation of surrounding circumstances, expectations, and relationships" (*Williams*, 187 F.3d at 562, *quoting , Oncale*, 118 S.Ct. at 1003) in assessing whether a hostile environment exists, the court is still constrained to find *facts* supported by *record evidence* which establishes a hostile work environment. Vaughn's argument is one of the tail wagging the dog. Rather than evaluating as we must the evidence to determine whether the cumulation of evidence establishes a hostile work environment, Vaughn

- 15 -

would have the court start from a general premise that gender bias exists and superimpose that premise on all aspects of LWC's operation.[9] We find that there is a no genuine issue of material fact with respect to the claim of hostile work environment. The inappropriate and hostile behavior of Eiler and, upper management's responses to it form the sum total of Vaughn's sexual harassment claim when the generalizations and hyperbole are disregarded and the record evidence is evaluated. Eiler's inappropriate comments and angry displays have not been shown to be so pervasive or severe that a reasonable person would find the environment hostile or abusive. *Compare*, *Morris v. Oldham County Fiscal Court*, 201 F.3d 784,790 (6th Cir. 2000)(holding that the employer's alleged request for sexual favors from the employee in exchange for a better evaluation, calling the employee "Hot Lips," making comments about the employee's state of dress, and telling dirty jokes in front of the employee did not create a hostile work environment); *Burnett v. Tyco Corp*, 203 F.3d 980 (6th Cir. 2000)(holding that the conduct of a supervisor who placed a pack of cigarettes under a female employee's bra strap, remarked that she had "lost her cherry," and said that he was aroused by the phrase "dick the malls" was not sufficiently severe to create a hostile work environment); *Black v. Zaring Homes, inc.*, 104 F.3d 822, 826 (6th Cir. 1997)(holding that a supervisor's teasing about the employee dancing on tables at a local strip bar, joking about "Hooterville" and "Titsville," calling her a "broad," and making fun of her pronuncition of "bosom" did not create an objectively hostile environment). Vaughn has not alleged that she was the recipient of Eiler's nastiness until after he was reported in mid-2002. As previously noted, none of Vaughn's claims of gender

---

[9]We note that our decision herein is not necessarily in conflict with the labor department finding of a hostile work environment and we express no opinion as to its correctness. We are faced here with the question of whether Vaughn has shown that LWC was so permeated with anti-female bias that the actions could be viewed by a jury as humiliating and fundamentally offensive to any woman in that work environment. Claims under Title VII are put to both a subjective and objective test. That is, the conduct must be so severe and pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim. *Randolph*, 453 F.3d at 733.

discrimination have been shown to have an actual gender component.  Rather Vaughn seeks impermissibly to second guess LWC's daily management decisions.  While she appears to sincerely believe that she should have received greater pay and greater opportunities in her employment, she has not shown that any of these decisions were made because she is female.

Vaughn has come forward with evidence to support her allegations that she spoke out about Eiler's poor treatment of a number of female employees, and that her complaints were either ignored or ineptly and ineffectively handled until June of 2002 when she reported her suspicions of discriminatory pay to diversity counsel.

Vaughn has established that even after Eiler was reassigned to another location, he was allowed to remain in the office, in close proximity to Vaughn and others in the Right of Way department for a month or more, making for a situationally difficult and uncomfortable work environment.  Vaughn alleges that Eiler engaged in intimidating behavior, such as pulling up behind her in the parking lot on one occasion, standing in her path in the office, and staring her down.  While LWC might have been wise to remove an angry Eiler from the situation sooner to avoid the discomfort and his purported angry response to his accusers, it did address the unacceptable behavior and eventually removed him from the work group.  The periodic intimidation due to Eiler's continued presence lasted from the date of his reassignment in mid-September until he was moved to another location in November.  While this was stressful and disconcerting, Vaughn also was aware that it was for a limited period of time.  Vaughn testified that she was not prevented from performing the tasks of her job.  Her only concern was the discomfort from his presence on the floor.  The court does not find that a reasonbale person would find that the Eiler situation created a serious and pervasive hostile work environment for Vaughn.

- 18 -

There has been evidence offered concerning LWC's handling of a number of other incidents of alleged harassment of female employees by other male management personnel allegedly occurring in 2002 and 2003. These incidents have not been shown to bear any relation to Vaughn or her harassment claim.

We note in conclusion that our decision concerning the hostile environment claim does not draw upon any of the findings in the NORIs.  While the NORIs make for interesting reading, painting a broader picture of sexual harassment in the LWC workplace, they do not form the basis for our findings of fact and conclusions of law under Title VII.  Indeed, as noted earlier, Vaughn has not offered the NORIs for an preclusive effect in this court, but rather as supplemental documentation in support of her opposition to summary judgment.  Our decision concerning the claim of hostile environment is premised upon the conclusion that the admittedly problematic conduct of Eiler and LWC's handling of the issue is the only aspect of Vaughn's complaint which is gender-based.  As that situation was resolved, Eiler moved from the process, and Vaughn's ability to perform her job was unimpaired, we cannot find that Vaughn was subjected to a severe and pervasive hostile environment.

For the reasons set forth herein, summary judgment will be granted and the amended complaint will be dismissed.  A separate order will be entered this date in accordance with this opinion.